**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| GWENDOLYN GRIFFIN ODOM, | |
| Plaintiff, | CIVIL ACTION NO.: 4:20-cv-264 |
| v. | |
| COASTAL STATES AUTOMOTIVE GROUP MANAGEMENT, LLC, | |
| Defendant. | |

## <u>O R D E R</u>

Plaintiff Gwendolyn Griffin Odom brings this action against her former employer, Defendant Coastal States Automotive Group Management, LLC ("Coastal States"), under Title VII of the Civil Rights Act of 1974, 42 U.S.C. § 2000e, *et seq.*, alleging that Coastal States terminated her for rejecting her supervisor's sexual demands.  (Doc. 1.)  Presently before the Court is Defendant's Motion for Summary Judgment, in which it argues, *inter alia*, that Plaintiff has failed to establish a *prima facie* claim of sexual harassment or retaliation under Title VII.  (Doc. 45.)  Plaintiff filed a Response, (docs. 47, 48-2), and Defendant filed a Reply, (doc. 51).  For the reasons set forth below, the Court **GRANTS** Defendant Coastal States' Motion for Summary Judgment.  (Doc. 45.)

## BACKGROUND

### I.    Plaintiff's Friendship with Bryant and Employment at the Dealership

Plaintiff worked at Defendant Coastal States' Savannah Volkswagen Dealership (the "Dealership") from December 2019 until May 2020.  (Doc. 45-2, p. 1; doc. 48-1, p. 1.)  Prior to

working at the Dealership, Plaintiff sold cars at the Chatham Parkway Toyota dealership ("Chatham Toyota"), where she met Anthony Bryant. (Doc. 45-2, p. 1; doc. 48-1, p. 1; see doc. 43, p. 12.) Plaintiff and Bryant worked together at Chatham Toyota from 2006 to 2007. (Doc. 43, p. 12.) Although Plaintiff and Bryant never had a romantic relationship, Plaintiff considered Bryant a friend, and they remained in contact after they left Chatham Toyota. (Doc. 45-2, p. 2; doc. 48-1, pp. 1–2; see doc. 41, p. 19; doc. 43, pp. 12–13, 43.)

In 2019, Plaintiff and her daughter, Eden Odom ("Eden"), were living at an extended stay hotel while looking for work. (Doc. 45-2, p. 3; doc. 48-1, p. 2; see doc. 44, pp. 10–11, 14–15.) At that time, Bryant was the Interim General Manager of the Dealership. (Doc. 45-2, p. 4; doc. 48-1, p. 4; see doc. 41, p. 24.) Bryant testified that, at some point, Plaintiff informed him that she was having financial troubles. (Doc. 43, pp. 13, 22; see also doc. 45-5, p. 2.) Bryant offered Plaintiff a job selling cars for Defendant at the Dealership. (Doc. 43, pp. 22–23; doc. 45-5, p. 1; see doc. 41, p. 20.) Plaintiff began working at the Dealership in December 2019. (Doc. 45-2, p. 1; doc. 48-1, p. 1.) Plaintiff testified that Bryant was her supervisor at the Dealership, (doc. 41, p. 24), although she was also managed by Rob Benjamin, the Dealership's Used Car Manager, who reported to Bryant. (Doc. 45-2, p. 4; doc. 48-1, p. 4; see also doc. 45-5, p. 1; doc. 41, p. 24.)

## II.  Plaintiff's Absences from Work

In January 2020, Plaintiff requested time off from work, but her request was denied. (Doc. 45-2, p. 5; doc. 48-1, p. 5.) However, Plaintiff ended up being out of work around that time without prior approval.[1] (Doc. 45-2, p. 5; see doc. 41, pp. 71–72; doc. 45-5, p. 2.) When she returned,

---

[1]  The parties disagree about why Plaintiff was requesting time off from work. According to Bryant, Plaintiff requested time off to attend Pro Bowl Weekend in Florida. (Doc. 45-5, p. 2; see doc. 45-2, p. 5.) However, Plaintiff denies that she attended the Pro Bowl and, instead, contends that she "missed work for medical reasons, which Bryant need not be privy to[]." (Doc. 48-1, p. 5.) Plaintiff also testified that she went to Florida because her son's girlfriend was being induced into labor. (Doc. 41, pp. 71–72.)

Bryant asked to speak to Plaintiff following a sales meeting.  (Doc. 45-2, p. 5; doc. 45-5, p. 2; <u>see</u> doc. 41, pp. 69–74.)  Plaintiff recorded their exchange.  (Doc. 45-2, p. 5; doc. 48-1, p. 5; <u>see</u> doc. 41, pp. 69–74.)  During the meeting, Bryant asked Plaintiff if she had attended the Pro Bowl, and Plaintiff said that she was absent because her son's girlfriend had been induced into labor and had given birth to Plaintiff's grandchild.  (Doc. 41, p. 70.)  Bryant responded stating, "I don't mind something happening, but you got to communicate."  (<u>Id.</u>)  Bryant also informed her that the team missed its sales goal on the day she was absent and asked her to "keep [him] up to date."  (<u>Id.</u> at pp. 72, 74.)  Plaintiff testified that she felt Bryant was prying into her business and that this conversation reveals his insistence on knowing why and where she was going whenever she requested off or called out from work.  (<u>Id.</u> at pp. 71–73; <u>see id.</u> at pp. 65, 109.)

Plaintiff also recorded a conversation she had with Bryant after she had called out sick from work and failed to respond to text messages about when she was coming back.  (Doc. 45-2, p. 6, doc. 48-1, p. 5; <u>see</u> doc. 41, p. 67.)  In the recording, Plaintiff told Bryant that she had responded when she could due to her illness.  (Doc. 45-2, p. 6; doc. 48-1, p. 5; <u>see</u> doc. 45-5, p. 2.)  Additionally, during one of these recorded conversations, Plaintiff told Bryant that she was "fed up" with him, and, while discussing her absences, stated, "I don't like your tone" and "you got a tone with me."  (Doc. 45-2, p. 6; doc. 48-1, p. 5; <u>see</u> doc. 41, pp. 110–11.)  Plaintiff also demanded that Bryant "change the way [he was] talking to [her]."[2]  (Doc. 45-2, p. 6; doc. 48-1, p. 5; <u>see</u> doc. 41, pp. 110–11.)  Plaintiff testified that those comments "just came out" because she was "fed up" and "tired of [Bryant] . . . coming at [her]."  (Doc. 41, pp. 110–11.)

---

[2]  It is unclear from the record whether Plaintiff made these statements to Bryant during their conversation following her trip to Florida or during the conversation following her absence due to illness.  (<u>See</u> doc. 41, p. 110.)

In February 2020, Plaintiff spoke with Deborah Guenther-Alexiou, Defendant's Human Resources ("HR") Manager, about needing to take time off for medical reasons, which she did not want to discuss with Bryant (or any other man).  (Doc. 45-2, p. 6; doc. 48-1, p. 5; see doc. 45-3, pp. 2, 4–7; doc. 45-5, p. 2; see also doc. 41, p. 109.)  Guenther-Alexiou agreed to (and ultimately did) advise Bryant that Plaintiff would need to miss work to receive medical treatment without discussing the specific details of her absence.  (Doc. 45-3, pp. 2, 4–7.)  However, she instructed Plaintiff to provide advance notice of her absences and to be sensitive to Bryant's scheduling.  (Doc. 45-2, p. 6; doc. 48-1, p. 5; see doc. 45-3, pp. 2, 4–7; doc. 45-5, p. 2.)   Plaintiff does not dispute that, despite this instruction, she continued not to notify Bryant in advance of her medical absences, and Guenther-Alexiou reminded her of her obligation to do so out of respect for Defendant's business needs.  (Doc. 45-2, p. 6; doc. 48-1, p. 5; see doc. 45-3, p. 2; doc. 45-5, p. 2.)  Guenther-Alexiou stated that Plaintiff appeared to want to set her own schedule, was "frustrated that she would not get permission to be out of work," and "seemed entitled to leave and time off that she had not earned in her short tenure [at] [the Dealership]."  (Doc. 45-3, p. 2.)

### III.   Defendant's Car Sales Procedures and Plaintiff's Sales Performance

Salespersons at the Dealership are paid a salary of commission based on their sales and receive a monthly $2,000 "draw" against their commission earnings.  (Doc. 45-2, p. 15; doc. 48-1, p. 11; see doc. 45-4, p. 6.)  When a salesperson's commission earnings are less than their "draw," he or she accrues a deficit referred to as being "in the hole."  (Doc. 45-2, p. 15; doc. 48-1, p. 11; see doc. 45-4, p. 3.)  If a salesperson does not sell enough cars to cover their draw, he or she still receives a draw (i.e., is paid $2,000) but is not paid anything else until he or she is out of the hole.  (Doc. 45-2, p. 15; doc. 48-1, p. 11; doc. 45-4, p. 3.)  During her five-month tenure at the Dealership, Plaintiff earned enough commission to cover her monthly draw only once.  (Doc. 45-2, p. 18, doc.

48-1, p. 13.)  Bryant testified that Plaintiff ranked "on the lower end of . . . performance."  (Doc. 43, p. 46.)    Indeed, Plaintiff agreed that her commission summary reflects subpar sales performance.  (Doc. 45-2, p. 18, doc. 48-1, p. 13; <u>see</u> doc. 41, pp. 113, 218.)  According to the commission summary, Plaintiff sold on average 6.33 cars per month, (doc. 41, p. 218), while average salespersons sold 8 to 10 cars per month, and the top sellers sold 18 to 20 per month, (doc. 45-2, p. 18; doc. 48-1, pp. 13–14).  Additionally, when the COVID-19 pandemic began, Defendant temporarily furloughed Plaintiff because she was one of the two lowest performing salespersons.  (Doc. 45-2, p. 8; doc. 48-1, p. 6.)

As the General Manager, Bryant had the discretion to split deals (and, therefore, divide the resulting commissions) between salespersons.  (<u>See</u> doc. 43, pp. 32–33, 38–39; doc. 45-4, p. 3.)  In April 2020, a month before Plaintiff's termination, Bryant allowed another salesperson to sell a vehicle, without notifying Plaintiff, that the brother of one of Plaintiff's customers had test-driven the day before (at times, the "April 2020 Sale").  (Doc. 45-2, p. 16, doc. 48-1, p. 12; <u>see</u> doc. 41, pp. 96–97.)  Plaintiff's customer had planned to pay cash or secure financing from an outside source.  (Doc. 41, pp. 96, 100.)  The purchaser of the vehicle paid a higher price than Plaintiff's customer would have paid and financed the loan through the Dealership, resulting in greater profits.  (Doc. 45-2, p. 16, doc. 48-1, p. 12; <u>see</u> doc. 41, pp. 98–100.)  When Plaintiff learned that the vehicle had been sold, she confronted Bryant, who told her that she had "dropped the ball" because she had taken the car to the Dealership's service department.  (Doc. 41, pp. 97.)  Plaintiff testified, however, that Bryant told her to put the car in service after she informed him that her customer's brother had said the vehicle was producing a strange sound during the test-drive.  (<u>Id.</u> at pp. 96–97.)  In any event, after Plaintiff followed up with Bryant, he told her that "all was not lost" because he would be willing to give her half the commission from that sale if she delivered

the vehicle to the buyer.  (Doc. 45-2, p. 16; doc. 48-1, p. 12; doc. 41 at p. 98.)  Plaintiff also testified

that, after these events, she realized that "none of her [deals] went through" because Bryant was

stepping in to ensure that vehicles were being sold at higher prices and to buyers who were using

Dealership financing.  (See doc. 41, pp. 99–102.)

## IV.   Plaintiff's Termination and Subsequent Communications with Defendant's Executives and HR Department

Bryant terminated Plaintiff on May 13, 2020.  (Id. at p. 215.)   A Separation Notice

submitted to the Georgia Department of Labor states that her termination was "[p]erformance

based."  (Id.)  Prior to terminating Plaintiff, Bryant spoke to Holly Harn, Defendant's HR Director,

"to ensure the termination would not be a problem given" Plaintiff's previous failure to provide

advance notice of her absences to receive medical treatment.[3]  (Doc. 45-4, p. 2; doc. 45-5, p. 3.)

At the time of her termination, at least five other salespersons had been fired for attendance issues

and/or reasons related to COVID-19.  (Doc. 45-2, p. 8; doc. 48-1, p. 6; see doc. 45-4, p. 2.)  Indeed,

Defendant's Employee Handbook, a copy of which Plaintiff received and signed, states that

"[c]ontinuous unexcused . . . absenteeism of any time frame results in disciplinary action up to and

including termination of employment."  (Doc. 41, p. 192; see doc. 45-2, p. 8, doc. 48-1, p. 7.)

On May 29, 2020, Plaintiff e-mailed Warner Peacock and Jim Thayer, Defendant's

CEO/owner and COO at the time, respectively.  (Doc. 45-2, p. 19; doc. 48-1, p. 14; see doc. 41,

---

[3] While conceding that Bryant spoke with HR prior to terminating her, Plaintiff contends that the discussion "had nothing to do with [her] 'history of issues.'"  (See doc. 48-1, p. 13 (quoting doc. 45-2, p. 18).) Plaintiff's response does not create a genuine dispute as to this fact, however, because she does not cite to any portion of the record which contradicts or otherwise undermines Bryant or Harn's sworn statements that Bryant contacted Harn to discuss terminating Plaintiff given her prior failure to provide advance notice of her absences.  See Fed. R. Civ. P. 56(c)(1).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed R. Civ. P. 56(e)(2).  As such, the Court deems this fact admitted pursuant to Rule 56(e).

pp. 225–28.)  In the e-mail (the "Peacock E-mail"), Plaintiff accused Bryant of engaging in various unethical practices towards employees and customers, including unfair deal splits.  (See doc. 41, pp. 226–27.)   Plaintiff also claimed that Bryant "sexually harassed" her and was "having a romantic relationship" with two women at the Dealership.  (Id.)  The Peacock E-mail also states that Plaintiff "made less money because [she] refused to be [Bryant's] mistress" and that she "had a lot of deals that [Bryant] refused to work because [she] would not sleep with him."  (Id. at p. 226.)   Prior to sending the Peacock E-mail, Plaintiff had not complained about or otherwise notified Bryant, Benjamin, or anyone in HR about her allegations that Bryant had sexually harassed or made sexual advances towards her.  (Doc. 45-2, pp. 11, 14, 19; doc. 48-1, pp. 8, 10, 14; see doc. 42, p. 30.)  Indeed, Harn's Declaration states that although Plaintiff complained about Bryant's "attitude toward her and their conversations when she need[ed] to be out of work," she "never complained [to Harn] about . . . Bryant making sexual advances toward her."  (Doc. 45-4, p. 2.)  Furthermore, other than confronting Bryant after he authorized the April 2020 Sale, there is no indication in the record that Plaintiff ever complained about Bryant's deal splitting or the purported deals that Bryant "refused to work because [she] would not sleep with him."  (Doc. 41, pp. 226–27; see id. at pp. 96–100.)

After she sent the Peacock E-mail, Plaintiff met with Harn to discuss the allegations against Bryant described therein.  (Doc. 45-2, p. 22; doc. 48-1, p. 16; doc. 42, pp. 30–31.)  During their meeting, Plaintiff seemed most concerned with deal splitting, although she brought up Bryant's alleged sexual advances and stated that Bryant was disrespectful towards women.  (Doc. 45-2, p. 22; doc. 48-1, pp. 16–17; doc. 42, p. 33.)  However, Plaintiff did not "tie the deal splitting to any gender discrimination" or suggest to Harn that her sales were deficient because of her rejection of Bryant's advances.   (Doc. 45-2, p. 22; doc. 48-1, pp. 16–17; doc. 42, p. 33.)  Following their

meeting, Harn investigated Plaintiff's allegations and did not find any evidence that Bryant had harassed Plaintiff.  (Doc. 45-2, p. 23; doc. 42, p. 29.)

### V.      Plaintiff's EEOC Charge and Relevant Testimony Concerning the Allegations Therein

Plaintiff filed a Charge of Discrimination (the "Charge") with the EEOC alleging discrimination based on sex and retaliation.  (Doc. 41, pp. 181–82.)  In the "Particulars" section of the Charge, Plaintiff alleges the following facts: (1) "[s]hortly after I began working, Bryant began asking if I was dating anyone and telling me he could take care of me, he could pay all [of] my bills so I did not have to work[,] and he could make sure I made more money than anyone else"; (2) "Bryant would . . . comment on how I dressed and would ask me to change into a company t-shirt if I wore lo[o]se fitting tops or to pull my shirt up and tie it.  These comments were made whenever we worked together"; (3) "[i]n February 2020, Bryant suggested that he [would] put me up in an apartment[] [and] pay my rent and bills, provided he had a key to the apartment.  I flatly refused him"; and (4) "in March 2020, after meeting with Bryant, he walked around his desk to lean in and give me a hug.  I screamed and rejected him.  He went on to say that he made good money and could take care of me."  (Id. at p. 181.)   The Charge further alleges that when Bryant spoke to Plaintiff in his office, he "would reach to hold [her] hand or pat [her] hand" and that, "[a]fter continuously rejecting Bryant's advances[,] he would find reasons to reject [her] deals and allow employees who had no involve[ment] in [her] sale[s][] to receive partial credit and compensation" for the sales.  (Id. at p. 182.)

Plaintiff testified that she never reported these allegations to Defendant while she was employed at the Dealership.  (Doc. 45-2, pp. 10–14; doc. 48-1, pp. 7–11; see doc. 41, pp. 38–39.) However, Plaintiff stated that she told her daughter Eden about Bryant's comments concerning her appearance and dress and his attempt to hug her.  (Doc. 41, pp. 38, 45.)  Yet, during her own

deposition, Eden denied that Plaintiff had ever told her such things and testified that she did not recall Plaintiff stating that Bryant had ever touched her.  (Doc. 44, p. 40.)  Similarly, although Plaintiff testified that she told Eden that Bryant asked to sleep with Plaintiff, (doc. 41, p. 39), Eden stated that she did not recall whether Plaintiff disclosed that to her, (doc. 44, p. 40).[4]

Bryant admits that he suggested that Plaintiff and Eden use his credit to obtain an apartment, although he denies that he possessed or communicated to Plaintiff any ulterior motive (sexual or otherwise) for his offer.  (Doc. 45-2, p. 5, doc. 48-1, pp. 4–5; doc. 45-5, p. 2.)  Furthermore, he denies ever making sexual advances toward Plaintiff, telling her to tie her clothes to show her waist, informing her that he would take care of her, offering to pay her bills, asking her to date or have sex with him, touching her with any sexual or romantic intent, or making sexual jokes or comments towards her.  (Doc. 45-5, pp. 3–4.)  Additionally, he stated that he did not terminate Plaintiff for refusing to sleep with or have a romantic relationship with him and that he did not single out Plaintiff to reject or split her deals.  (See id. at p. 4.)

## VI.    Procedural History

On September 28, 2020, the EEOC issued Plaintiff a Notice of Right to Sue with respect to her Charge, allowing her to bring a lawsuit based on her allegations within ninety days.  (Doc. 1, p. 3; doc. 8, p. 6.)  Plaintiff timely initiated this action on October 27, 2020, by filing the Complaint, which generally alleges that Defendant engaged in sex discrimination and retaliated against Plaintiff in violation of Title VII when Bryant terminated her for refusing his sexual

---

[4] Plaintiff disputes that she testified that she told Eden about Bryant's comments related to her appearance and his request to sleep with her.  (See doc. 48–1, pp. 8–9.)  However, as discussed in Discussion Section I, infra, Plaintiff failed to properly dispute these facts because she did not cite to any portion of the record indicating that that was not the case.  (See id.); see also note 3, supra.  Indeed, it is clear from Plaintiff's deposition transcript that she did, in fact, testify that she shared this information with Eden.  (See doc. 41, pp. 38–39, 45.)

advances.  (Doc. 1, pp. 5–8.)  Plaintiff prays for, among other relief, general damages, lost wages and other economic damages, punitive damages, and attorneys' fees and costs.  (Id. at pp. 8–9.)

The parties engaged in discovery, and, on January 27, 2022, Defendant filed the at-issue Motion for Summary Judgment.  (Docs. 45, 45-1.)  On March 1, 2022, more than twenty-one days after Defendant filed the Motion, Plaintiff filed a Response.  (Docs. 47, 48-2.)  Defendant filed a Reply.  (Doc. 51.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party

discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  Thus, the Court will view the record and all reasonable inferences that can be drawn therefrom in Plaintiff's favor.  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (citation and emphasis omitted).

## DISCUSSION

## I.    Preliminary Matters

### A.    Whether Defendant's Motion Should Be Deemed Unopposed Under L.R. 7.5

Southern District of Georgia Local Rule 7.5 ("L.R. 7.5") provides that each party opposing a motion for summary judgment shall file a response within twenty-one days after service of the motion.  S.D. Ga. L.R. 7.5.  Failure to respond within twenty-one days "shall indicate" that the motion is unopposed.  Id.  Defendant argues that the Motion should be deemed unopposed pursuant to L.R. 7.5 because Plaintiff filed her Response on March 1, 2020, thirteen days after the February 17, 2020, deadline.  (Doc. 51, pp. 2–3.)  The Court disagrees.  L.R. 7.5 merely provides that a party's failure to timely respond to a motion for summary judgment "shall *indicate* that there is no opposition to a motion."  S.D. Ga. L.R. 7.5 (emphasis added).  It gives the Court discretion over

whether to consider a late-filed response; it does not, however, compel courts to wholly disregard an untimely response.  Indeed, a Notice filed on the docket alerting Plaintiff to the consequence of filing an untimely response stated only that the Court "*may* . . . deem the motion unopposed, and . . . *may* enter judgment against [Plaintiff]."  (Doc. 46, p. 1 (emphasis added).)  Although her tardiness is certainly objectionable, the Court declines to deem the Motion unopposed because the Response was not egregiously tardy and it addresses the substantive arguments Defendant raised in its Motion.  Cf. Mitchell v. Jackson, No. 6:17-cv-143, 2019 WL 4439504, at *4 (S.D. Ga. Aug. 14, 2019) (deeming motion for summary judgment unopposed where Plaintiff never filed a response); McDaniel v. Smith, No. 5:07-cv-079, 2009 WL 10690737, at *10 (S.D. Ga. Oct. 29, 2009), *rev'd in part on other grounds*, 396 F. App'x 628 (11th Cir. 2010) (same).

Furthermore, the Court rejects Defendant's argument that it is entitled to summary judgment because Plaintiff's untimely response "constitute[s] abandonment of her claims in total." (Doc. 51, p. 3.)  L.R. 7.5 does not provide—and Defendant cites no authority suggesting—that a party who files a response after twenty-one-days has abandoned their claims such that summary judgment is appropriate.  (See id. at pp. 2–3.)  Indeed, to the contrary, the Eleventh Circuit Court of Appeals has held that local rules cannot "allow summary judgment to be granted by default." United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., 363 F.3d 1099, 1102 (11th Cir. 2004).  Furthermore, district courts "cannot base the entry of summary judgment on the mere fact that [a] motion [for summary judgment] [is] unopposed, but, rather, must consider the merits of the motion."  Id. at 1101.  Thus, even if the Court were to deem the Motion unopposed (which it declines to do), it still would have to "review [Defendant's] citations to the record to determine if there is, indeed, no genuine issue of material fact."  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).

Based on the foregoing, the Court treats the Motion as opposed and proceeds to address its merits.

**B.      Whether the Facts Contained in Defendant's Statement of Material Facts Should Be Deemed Admitted Pursuant to L.R. 56.1 and/or Federal Rule of Civil Procedure 56(e)**

Relying upon Local Rule 56.1 ("L.R. 56.1"), Defendant argues that the Court should deem admitted the facts set forth in its "Statement of Material Facts to Which There is No Genuine Question" ("Defendant's SUMF"), (doc. 45-2), because Plaintiff filed her "Statement of Disputed Issues of Genuine Material Fact" ("Plaintiff's SUMF"), (doc. 48-1), after the twenty-one-day deadline.  (Doc. 51, p. 2.)  The Court disagrees.  L.R. 56.1 states that "[a]ll material facts set forth in the statement [of material facts] required to be served by the moving party will be deemed to be admitted *unless controverted by a statement served by the opposing party*."  S.D. Ga. L.R. 56.1 (emphasis added).  Although L.R. 56.1 states that a "[r]esponse to a motion for summary judgment shall be made within twenty-one days of service of the motion," it does not provide that a party who fails to do so will be deemed to have admitted the facts set forth in the moving party's required statement of material facts.  S.D. Ga. L.R. 56.1 (citing S.D. Ga. L.R. 7.5).  Thus, although Plaintiff's SUMF was untimely, its untimeliness is not a basis in and of itself for treating as admitted the facts in Defendant's SUMF under L.R. 56.1.

Defendant next argues that the facts set forth in its SUMF should be admitted pursuant to Federal Rule of Civil Procedure 56(e) because Plaintiff's SUMF "attempt[s] to dispute a fact without citations to materials or evidence in the record, and by offering citations which do not dispute the fact."  (Doc. 51, pp. 1–2 n.1.)  Rule 56(e) provides, "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P.

56(e).  Rule 56(c) provides that "[a] party asserting that a fact cannot be or is genuinely disputed

must support the assertion by" either "citing to particular parts of materials in the record . . . or . .

. showing that the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c).  Defendant is correct that Plaintiff's SUMF disputes certain facts without citing to any

materials or evidence in the record.  (See, e.g., doc. 48-1, pp. 5–6, ¶ 29, p. 7, ¶ 41, p. 8, ¶¶ 45–46.)

However, for the most part, Plaintiff cites to portions of the record to support her factual disputes.[5]

(See, e.g., id. at pp. 2–3, ¶ 12–13, p. 4, ¶ 19.)  Accordingly, the Court deems admitted only those

facts that Plaintiff has disputed without ever pointing to any controverting evidence *and* for which

Defendant has provided sufficient evidentiary support.  See Fed R. Civ. P. 56(e); see also Acheron

Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Pol'y Tr., No. 18-CV-25099, 2021 WL

7368630, at *2 (S.D. Fla. Sept. 24, 2021), *report and recommendation adopted*, No. 18-25099-

CIV-MORENO, 2022 WL 354241 (S.D. Fla. Feb. 7, 2022) ("Plaintiffs fail to offer controverting

evidence when disputing some of the facts asserted by Defendant.  . . .  Accordingly, the Court

---

[5]  Moreover, in response to similar arguments by moving parties in other cases, the Court has recognized that Local Rule 56.1 does not clearly describe the form that a party opposing summary judgment must employ when making a "statement" opposing the movant's material facts.  Thus, the Court has declined to deem admitted all the facts contained in a movant's statement of material facts simply because the party opposing summary judgment either did not file a statement in addition to a brief or did file a statement but did not include sufficient record cites within the statement.  See Ratchford v. F.D.I.C., No. 6:11-cv-107, 2013 WL 2285805, at *4 (S.D. Ga. May 23, 2013) ("[T]his District's rule does not define what constitutes a 'statement,' [in response to an opponent's statement of material facts] nor can the Court locate a case doing so.  Absent more direct guidance, the Court declines to import the [United States District Court for the Northern District of Georgia's local rule's] language requiring of such a statement individually numbered responses to a [statement of undisputed material facts].  To the extent that [the opponent's] response brief and attached exhibits controvert the [movant's statement of material facts], the Court will not deem the [statement of material facts] admitted.  On the other hand, if [the opponent] has submitted nothing to controvert a particular fact in the [statement of material facts], that individual fact is established as a matter of law."); see also United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus. of United States & Canada, AFL-CIO, Local 188 Pension Fund v. Johnson Controls, Inc., No. 4:18-cv-182, 2022 WL 1609277, at *3–4 (S.D. Ga. May 20, 2022); Oatman v. Augusta Collection Agency, Inc., No. 1:18-cv-089, 2019 WL 6770678, at *2 (S.D. Ga. Dec. 11, 2019), *on reconsideration in part*, No. 1:18-CV-089, 2020 WL 1916173 (S.D. Ga. Apr. 20, 2020).

deems facts admitted where Defendant provides sufficient evidentiary support for his assertion, and Plaintiffs fail to provide controverting evidence to support disputing the assertion.").

## II.   The Tangible Employment Action Sexual Harassment Claim (Count I)

### A.   Overview of Sexual Harassment Claims under Title VII and the Parties' Arguments

Plaintiff claims that Defendant discriminated against her based on her sex when Bryant, her supervisor, rejected her sales deals, allowed others to split her commission, and, ultimately, terminated her for refusing his repeated sexual advances.  (See doc. 1, pp. 5–7.)  Specifically, in Count I, Plaintiff alleges that "Defendant took tangible employment action against [her] because she refused to give in to Bryant's sexual demands.  To wit, Defendant terminated her employment because she rejected and opposed Bryant's sexual demands."[6]  (Id. at p. 6.)

Under Title VII, it is unlawful for an employer "to discharge any individual[] or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1). Sexual harassment may constitute discrimination based on sex for purposes of Title VII.  Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 508 (11th Cir. 2000).  "Generally, sexual harassment comes in two forms: harassment that does not result in a tangible employment

---

[6] Plaintiff styles Count I as a "*quid pro quo* claim." (Doc. 1, p. 5.) After the United States Supreme Court's decisions in Faragher v. City of Boca Raton, 524 U.S. 775 (1998) ("Faragher") and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) ("Ellerth"), courts in the Eleventh Circuit "no longer use the labels '*quid pro quo*' and 'hostile environment' to analyze whether an employer should be held liable on an employee's Title VII claim concerning a supervisor's sex-based harassment." Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1311 (11th Cir. 2001). Instead, courts in this Circuit separate supervisor harassment cases into two groups: "(1) harassment which culminates in a 'tangible employment action,' such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse 'tangible employment action' is taken but which is sufficient to constructively alter an employee's working conditions." Id. Here, since Count I explicitly alleges that Defendant "took tangible employment action against Plaintiff" when it fired her for rejecting Bryant's demands, (doc. 1, p. 6), the Court "treat[s] her '*quid pro quo*' claim as an adverse 'tangible employment action' claim," id. at 1311–12.

action (traditionally referred to as 'hostile work environment' harassment), and harassment that does result in a tangible employment action (traditionally referred to as '*quid pro quo*' harassment)." Id.  In order to establish a *prima facie* case of sexual harassment under Title VII, the plaintiff must show:

> (1) that he or she belongs to a protected group; (2) that [he or she] has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment . . . [has] been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999); see Johnson, 234 F.3d at 508 n.7 (clarifying that these *prima facie* elements apply when liability is premised upon a tangible employment action); see also Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1244 n.3 (11th Cir. 2004).

To prove sexual harassment in violation of Title VII, "a plaintiff may rely on one of two theories.  Under the first theory, the plaintiff must prove that the harassment culminated in a 'tangible employment action' against her.  Under the second or 'hostile work environment' theory, the plaintiff must prove that she suffered 'severe or pervasive conduct.'" Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006) (quoting Ellerth, 524 U.S. at 753–54) (internal citations omitted).  Stated differently, "tangible employment action and hostile environment . . . are the two alternative [theories] a plaintiff may [use to] establish a basis for the employer's vicarious liability, which is the fifth factor of a Title VII sexual harassment claim." Hulsey, 367 F.3d at 1246; see also Tomczyk v. Jocks & Jills Rests., LLC., 198 F. App'x 804, 811 (11th Cir. 2006).  "The essence of . . . the tangible employment action theory of sexual harassment[] is that the tangible employment action was taken against the employee because she failed to yield to the sexual advances of the harassing supervisor." Taylor v. CSX Transp., 418 F.

Supp. 2d 1284, 1300 (M.D. Ala. 2006) (citing Ellerth, 524 U.S. at 753).  "[W]hen a supervisor engages in harassment which results in an adverse 'tangible employment action' against the employee, the employer is automatically held vicariously liable for the harassment." Frederick, 246 F.3d at 1311 (citing Ellerth, 524 U.S. at 763).  Indeed, an employer is liable under Title VII "if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because [he or she] refused to give in to [the supervisor's] sexual overtures.  That liability exists regardless of whether the employee took advantage of any employer-provided system for reporting harassment." Hulsey, 367 F.3d at 1245.  This is because "a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer." Ellerth, 452 U.S. at 762.  However, an employer is not liable for a supervisor's acts unless there is "a causal link between the tangible employment action and the sexual harassment." Cotton, 434 F.3d at 1231.  Therefore, in order to survive summary judgment, an employee relying upon a tangible employment action theory must create a genuine dispute of fact as to causation. See Frederick, 246 F.3d at 1312; see also Arnold v. Tuskegee Univ., 212 F. App'x 803, 807 (11th Cir. 2006) (per curiam).

Defendant argues, *inter alia*, that it is entitled to summary judgment with respect to Count I because Plaintiff has failed to establish certain elements of a *prima facie* case of tangible employment action sexual harassment.[7]  (See doc. 45-1, pp. 13–17.)  Specifically, Defendant

---

[7]  Defendant also argues that summary judgment is warranted because Plaintiff failed to report Bryant's alleged harassment, and therefore, it is entitled to the Faragher/Ellerth affirmative defense.  (Doc. 45-1, pp. 18–20.)  This affirmative defense enables an employer to avoid liability if it proves that it "exercised reasonable care to prevent and promptly correct harassing behavior *and . . .* that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm." Frederick, 246 F.3d at 1313 (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765).  However, the Eleventh Circuit has explicitly held that the Faragher/Ellerth affirmative defense "applies only to employer liability based upon a hostile environment theory[;] [i]t has no effect upon employer liability based upon a tangible employment action theory." Hulsey, 367 F.3d at 1246.  Thus, since Count I is based explicitly (and exclusively) on a tangible employment action theory,

argues that Plaintiff has not met the second and third *prima facie* elements because she has provided no proof that she was "subjected to unwelcome sexual harassment or harassment on the basis of sex." (<u>Id.</u> at pp. 14–15; <u>see also</u> doc. 51, pp. 3–4.) Concerning the fifth *prima facie* element, Defendant argues that there is no basis for holding Defendant vicariously liable because Plaintiff failed to prove a causal connection between Bryant's alleged sexual advances (or her response thereto) and his decision to terminate her. (<u>See</u> doc. 45-1, pp. 15–17.) Plaintiff, on the other hand, contends that summary judgment is not warranted because she "has met her burden to establish a *prima facie* case of . . . harassment." (Doc. 48-2, p. 21.)

**B.      Second and Third *Prima Facie* Elements**

The second and third *prima facie* elements are, respectively, whether "the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature" and whether "the harassment . . . [has] been based on the sex of the employee." <u>Mendoza</u>, 195 F.3d at 1245. Defendant argues that Plaintiff has provided no proof that she was "subjected to unwelcome sexual harassment or harassment on the basis of sex." (Doc. 45-1, pp. 14–15; <u>see also</u> doc. 51, pp. 3–4.) As set forth below, the Court disagrees and finds that there is a genuine dispute of fact as to the second and third *prima facie* elements because Plaintiff has pointed to sufficient evidence that Bryant made sexual advances towards her because of her sex.

"[A] victim need not provide evidence of a direct and express sexual demand to make a claim under the 'tangible employment action' analysis." <u>Frederick</u>, 246 F.3d at 1312; <u>see</u> <u>Llampallas v. Mini-Circuits, Lab, Inc.</u>, 163 F.3d 1236, 1246 (11th Cir. 1998) ("[C]ourts must rely

---

the defense is inapplicable. (Doc. 1, pp. 5–7.) Accordingly, Defendant's arguments based on the defense are inapposite, and the Court declines to address them.

on inferences drawn from the observable facts to determine whether a Title VII violation has occurred."). "[S]exual asides and insinuations are the well-worn tools of a sexual harasser," and "a supervisor may simply intimate that a subordinate's career prospects will suffer if she does not submit to his advances, with the hope of concealing his harassment if his statements are repeated to a third party." Frederick, 246 F.3d at 1312. Furthermore, "[w]hen a person 'sexually harasses' another, i.e., makes comments or advances of an erotic or sexual nature, [courts] infer that 'the harasser [is making] advances towards the victim because the victim is a member of the gender the harasser prefers.'" Llampallas, 163 F.3d at 1246; see Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) ("Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations[] because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex.").

Here, there is conflicting evidence about whether Bryant made sexual advances towards Plaintiff or offered her a job benefit in return for Plaintiff's agreement to engage in a sexual relationship with him. Plaintiff testified during her deposition that Bryant told her, "I can make sure that you make more money than anybody else, you know, if you would go out with me . . . [or] . . . if you would sleep with me." (Doc. 41, p. 30.) Plaintiff also testified that she told Eden that Bryant made inappropriate comments concerning Plaintiff's appearance and dress, attempted to hug Plaintiff, and asked to date or sleep with Plaintiff. (Id. at pp. 38–39, 45; doc 45-2, pp. 11–13.) Consistent with her testimony, Plaintiff's Charge states: "Bryant would . . . comment on how I dressed and would ask me to change into a company t-shirt if I wore lo[o]se fitting tops or to pull my shirt up and tie it. These comments were made whenever we worked together," and "in March 2020, after meeting with Bryant, he walked around his desk to lean in and give me a hug. I

screamed and rejected him.  He went on to say that he made good money and could take care of me."  (Doc. 41, p. 181.)   The Charge further alleges that when Bryant spoke to Plaintiff in his office, he "would reach to hold [her] hand or pat [her] hand" and that, "[a]fter continuously rejecting Bryant's advances[,] he would find reasons to reject [her] deals and allow employees who had no involve[ment] in [her] sale[s][] to receive partial credit and compensation."  (Id. at p. 182.)  Furthermore, in the Peacock E-mail, Plaintiff claimed that Bryant "sexually harassed" her, that she "made less money because [she] refused to be [Bryant's] mistress," and that she "had a lot of deals that [Bryant] refused to work because [she] would not sleep with him."  (See id. at p. 227.)  Harn testified that, during their meeting to discuss Plaintiff's allegations in the Peacock E-mail, Plaintiff brought up that Bryant had made sexual advances towards her and accused him of being disrespectful towards women.  (Doc. 42, p. 33–34.)  Finally, Eden testified that Plaintiff told her that Bryant had offered to pay Plaintiff's bills and that Plaintiff was upset and "insinuated" that Bryant was "trying to make [a pass] on . . . her."  (Doc. 44, pp. 37–38.)

To be sure, the record contains evidence that contradicts—or, at the very least, undermines—the foregoing testimony and statements provided by Plaintiff.  For instance, Eden *denies* that Plaintiff informed her that Bryant had commented on Plaintiff's appearance or tried to hug her and testified that she did not recall whether Plaintiff had told her that Bryan had touched or asked to date or sleep with Plaintiff.  (Doc. 44, p. 40.)  Furthermore, Bryant's sworn declaration states that he never (1) "made any sexual advances toward [Plaintiff]," (2) "asked [Plaintiff] to go on a date with me, sleep with me[,] or have sex with me," (3) "told [Plaintiff] she would make more money if she went on a date with me, slept with me[,] or had sex with me," (4) "made any sexual jokes or comments toward any employee[] at [the Dealership]," or (5) "rejected or split deals because an employee refused to sleep with me or refused to have a romantic relationship

with me." (Doc. 45-5, pp. 3–4.) Additionally, Guenther-Alexiou and Harn's Declarations contend that "[Plaintiff] never complained about . . . Bryant making sexual advances toward her," that they "never witnessed . . . Bryant make any sexual jokes or comments toward any employees at [the Dealership]," and that they "never [saw] or heard of . . . Bryant splitting deals or taking deals from employees who refuse to sleep with him or have a romantic relationship with him." (Doc. 45-3, pp. 2–3; doc. 45-4, pp. 2–3.) However, these testimonies do nothing more than create a dispute of material fact. A reasonable jury could credit Plaintiff's testimony and prior statements over the other testimonies and, based on her testimony and statements, conclude that Defendant made sexual advances towards Plaintiff because of her sex.

Notwithstanding this conflicting evidence, Defendant contends that Plaintiff has failed to create a genuine dispute of fact as to the second and third *prima facie* elements because "[n]either [the] Complaint [n]or [the] Charge mentions a solicitation for sex or sexual favor." (Doc. 45-1, p. 14.) This argument is factually and legally incorrect. First, the Complaint explicitly alleges that Plaintiff "continuously rejected and opposed . . . Bryant's [continued] advances" and that Bryant "took tangible employment action against [her] because she refused to give in to Bryant's sexual demands." (Doc. 1, pp. 4, 6.) Additionally, the Charge states, "[a]fter continuously rejecting Bryant's advances he would find reasons to reject my deals and allow employees who had no involve[ment] in my sale[] to receive partial credit and compensation from my sale." (Doc. 41, p. 182.) Furthermore, both the Complaint and the Charge allege that, "[i]n March 2020, after meeting with Bryant, he walked around his desk to lean in and give Plaintiff a hug. Plaintiff screamed and rejected him. Bryant went on to say that he made good money and could take care of Plaintiff." (Doc. 1, p. 4; see doc. 41, p. 181.)

Secondly, Defendant has filed a motion for summary judgment, not a Rule 12(b)(6) motion to dismiss for failure to state a claim or Rule 12(c) motion for judgment on the pleadings. Therefore, it is inapposite whether the Complaint "mentions a solicitation for sex or sexual favor." (Doc. 45-1, p. 14.)  As the party moving for summary judgment, Defendant bears the burden to identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton, 631 F.3d at 1341. Defendant fails to cite any authority—and the Court is not aware of any—establishing that the moving party may satisfy this burden by pointing out deficiencies in the pleadings themselves.  To the contrary, Rule 56 states that "[a] party asserting that a fact cannot be or is genuinely disputed *must* support the assertion by" citing to "particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1). Notably, pleadings are not one of the "materials in the record" listed in Rule 56(c).  See id. Additionally, once Defendant discharges his or her burden, the nonmovant must *go beyond the pleadings* and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257 (emphasis added).  Indeed, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment 'may not rest upon mere allegations or denials of his pleading[] but must set forth specific facts showing that there is a genuine issue for trial.'"  Id. at 256 (quoting Fed. R Civ. P. 56(e)).

Based on the forgoing, there is a genuine dispute of fact as to second and third *prima facie* elements, i.e., whether Plaintiff was subjected to unwelcome sexual harassment from Bryant based on her sex.  As such, the Court declines to grant Defendant summary judgment as to Count I on this basis.

### C.      Fifth *Prima Facie* Element

Defendant also maintains that summary judgment is warranted with respect to Count I because Plaintiff cannot satisfy the "basis for liability" element (i.e., the fifth element) of the *prima facie* case.  (See doc. 45-1, pp. 15–17; see also doc. 51, pp. 5–6.)  To satisfy this element, a plaintiff must establish a basis for holding the defendant-employer liable for its employee's alleged harassment.  Mendoza, 195 F.3d at 1245.  As noted above, a plaintiff may hold an employer vicariously liable by showing that her supervisor took an adverse tangible employment action against her for failing to acquiesce to the supervisor's sexual advances or demands.  See Frederick, 246 F.3d at 1311 (citing Ellerth, 524 U.S. at 763); see also Hulsey, 367 F.3d at 1246.  "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits, and, in most cases[,] inflicts direct economic harm."  Fields v. Atlanta Indep. Sch. Sys., 916 F. Supp. 2d 1348, 1363 (N.D. Ga. 2013) (quoting Arnold, 212 F. App'x. at 807).  However, "[t]o recover under the 'tangible employment action' theory of sexual harassment, the plaintiff must prove a causal link between the tangible employment action and the incident(s) of sexual harassment."[8]  Arnold, 212 F. App'x at 807; see also Cotton, 434 F.3d at 1231–32.

The Complaint alleges that "Defendant took tangible employment action against Plaintiff because she refused to give in to Bryant's sexual demands.  To wit, Defendant terminated her employment because she rejected and opposed Bryant's sexual demands." (Doc. 1, p. 6.) Defendant concedes that Bryant terminated Plaintiff on May 13, 2020. (Doc. 45-1, p. 11; doc. 45-

---

[8]  Thus, to the extent Plaintiff argues that she need not show a causal connection between Bryant's alleged sexual harassment and her termination to make out a *prima facie* tangible employment action claim, this argument fails.  (See doc. 48-2, pp. 15–18.)

2, pp. 17–18.)  Indeed, both Plaintiff and Bryant testified that Bryant made the decision to fire Plaintiff.  (Doc. 41, p. 75; doc. 43, p. 45.)  "A discharge is unquestionably a tangible employment decision."  Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1281 (11th Cir. 2003) (citing Ellerth, 524 U.S. at 761).  Thus, Plaintiff suffered an adverse tangible employment action when Bryant terminated her.[9]  Nonetheless, Defendant argues that it is entitled to summary judgment because "Plaintiff has offered no evidence to demonstrate [that] the alleged discrimination, or her reaction thereto, tangibly affected her compensation or employment."  (Doc. 45-1, p. 15.)  More specifically, Defendant contends that "Plaintiff does not connect her termination to any alleged discrimination or her reaction to the alleged discrimination."  (Id. at p. 17.)

It is true that Defendant cannot be held vicariously liable unless Plaintiff proves that there is "a causal link between [her termination] and [Bryant's alleged sexual harassment]."  Cotton, 434 F.3d at 1231.  Yet, Defendant ignores the fact that Bryant, the alleged harasser, made the decision to terminate Plaintiff.  "[A]ny time the harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision."  Llampallas, 163 F.3d at 1247; see also Johnson, 234 F.3d at 509–10 (recognizing this inference); Arnold, 212 F. App'x at 808 (same).  This inference arises from the assumption that a harasser cannot "act as an objective, non-

---

[9]  It is not clear whether Plaintiff also contends that Bryant's alleged decisions to reject or split her deals constitute adverse tangible employment actions.  The Complaint alleges that "[a]fter Plaintiff continuously rejected and opposed . . . Bryant's advances, Bryant started retaliating against Plaintiff by rejecting her sales deals and allowing employees who were not involved in her sales to receive partial credit and compensation for Plaintiff's sales."  (Doc. 1, p. 4.)  Furthermore, Plaintiff's Response focuses primarily on Bryant's decisions with respect to her deals rather than her termination.  (See doc. 48-2, pp. 16–17, 21.)  Ultimately, though, whether Plaintiff makes this argument is irrelevant.  Assuming (without deciding) that Bryant's conduct with respect to Plaintiff's sales qualifies as an adverse tangible employment action, Plaintiff has failed to point to sufficient evidence to create a triable issue as to whether Bryant's actions were causally linked to his alleged harassment.  In other words, as with her termination, Plaintiff has not sufficiently shown that Bryant rejected or split her deals because she refused to sleep with or date him.  See Discussion Section II.B, supra.

discriminatory decisionmaker with respect to the plaintiff" because he or she "harbors discriminatory animus towards the plaintiff." Llampallas, 163 F.3d at 1247.   Since it is undisputed that Bryant terminated Plaintiff, Llampallas's inference that Bryant (the decisionmaker) was motivated by discriminatory animus applies here.   See Washington v. Sch. Bd. of Miami-Dade Cnty., No. 01-3343-CIV, 2002 WL 31056094, at *4 (S.D. Fla. July 19, 2002)  ("To the extent Plaintiff alleges she was sexually harassed by her supervisor and that he participated in decisions affecting her employment, she has established a causal link."); cf. Williams v. Ala. Dep't of Corr., No. 2:15-cv-02252-RDP, 2018 WL 2960496, at *11 (N.D. Ala. June 13, 2018) ("In this case, Plaintiff cannot rely on [Llampallas's inference] because Commissioner Sharp, not [the alleged harasser], made the decision to terminate him.").

Notwithstanding, "an inference [of causation] may be negated by unrebutted evidence showing that the tangible employment action was based on grounds independent of the alleged harassment."  Arnold, 212 F. App'x at 808 (citing Frederick, 246 F.3d at 1312); see Fields, 916 F. Supp. 2d at 1365–66 ("Even if the Court found that Fields could benefit from the inference of causation that would exist if [the decisionmaker] had merely rubberstamped [the harasser's] recommendation, defendants have set forth an independent reason for Fields' termination that she has failed to rebut."); Spivey v. Akstein, No. 104CV1003WSDCCH, 2005 WL 3592065, at *15 (N.D. Ga. Dec. 30, 2005) ("Even if Plaintiff could present a *prima facie* case by showing that her supervisor and harasser terminated her, the Eye Center could still escape liability by showing that its decision to terminate Plaintiff was unrelated to her sex and was based on a legitimate non-discriminatory reason.") (citing Walton, 347 F.3d at 1282–83); see also Smith v. Cashland, Inc., 193 F.3d 1158, 1160 (10th Cir. 1999) (stating that an employer may refute a sexual harassment claim premised upon a tangible employment action "with proof that . . . the decision to terminate

was made for legitimate business reasons and not because the employee refused to submit to sexual demands"). Thus, Defendant "can defeat the inference that [Bryant's] harassment caused [Plaintiff's] termination if it shows independent justification for [Plaintiff's] termination." Andrews v. Pryor Giggey Co., No. 1:13-cv-00835-KOB, 2015 WL 225449, at *8 (N.D. Ala. Jan. 16, 2015)

According to Defendant, Bryant fired Plaintiff for multiple nondiscriminatory reasons, such as her "negative attitude regarding attendance and coaching" and subpar sales performance. (Doc. 45-1, pp. 21–22.) Indeed, there is ample unrebutted evidence suggesting that Plaintiff was terminated for these reasons. Concerning attendance, it is undisputed that Plaintiff missed work without prior approval to go to Florida during her first month at the Dealership. (See doc. 41, pp. 71–72; doc. 45-5, p. 2; see also doc. 45-2, p. 5; doc. 48-1, p. 5.) The parties agree that when Plaintiff returned from Florida, Bryant told her that the team missed its sales goal on the day she was absent, stated that she "[needed] to communicate," and instructed her to "keep [him] up to date." (Doc. 41, pp. 72, 74.) Nonetheless, the evidence shows at least one instance where Plaintiff, while absent due to illness, failed to respond to text messages from Bryant about when she would be returning to work. (Doc. 45-2, p. 6, doc. 48-1, p. 5; see doc. 41, p. 67.) Additionally, Plaintiff concedes that she failed to follow Guenther-Alexiou's instructions to notify Bryant in advance when she would be absent to attend her medical appointments. (Doc. 45-2, p. 6; doc. 48-1, p. 5; see doc. 45-3, pp. 2, 4–7; doc. 45-5, p. 2.) In fact, Guenther-Alexiou had to remind Plaintiff of her obligation to do so out of respect for Defendant's business needs. (Doc. 45-2, p. 6; doc. 48-1, p. 5; see doc. 45-3, p. 2; doc. 45-5, p. 2.) Moreover, according to Defendant's Employee Handbook, a copy of which Plaintiff received and signed, continuous unexcused absenteeism is a terminable offense. (Doc. 41, p. 192; see doc. 45-2, p. 8, doc. 48-1, p. 7.) Nonetheless, before firing Plaintiff,

Bryant spoke to Harn "to ensure the termination would not be a problem given" Plaintiff's previous failures to provide advance notice of her absences to receive medical treatment.  (Doc. 45-4, p. 2; doc. 45-5, p. 3); <u>see</u> Background Section IV, note 3, <u>supra</u> (deeming this fact admitted).

Concerning Plaintiff's attitude, it is undisputed that, during a discussion about her absences, Plaintiff told Bryant, "I don't like your tone" and "you got a tone with me," and demanded that he "change the way [he was] talking to [her]."  (Doc. 45-2, p. 6; doc. 48-1, p. 5; <u>see</u> doc. 41, pp. 110–11.)  Plaintiff testified that she spoke to Bryant this way because she was "fed up" and "tired of [Bryant] . . . coming at [her]."  (Doc. 41, p. 110.)  Additionally, Bryant's Declaration states that he noticed that Plaintiff "began to have a bad attitude when discussing other topics . . ., not just her attendance," and "was resistant and hostile to [his] . . . coaching about how to close a sales deal."  (Doc. 45-5, p. 3.)   Bryant also testified that Plaintiff's "attitude was just negative about anything, any direction or coaching that [he] tried to give her."  (Doc. 43, p. 65.)  Finally, concerning her sales performance, it is undisputed that Plaintiff earned enough commission to cover her monthly draw only once during her five months at the Dealership.  (Doc. 45-2, p. 18, doc. 48-1, p. 13.)  Plaintiff conceded during her deposition that she knew her sales performance was "sub-par" and that her commission summary reflected this.  (Doc. 41, pp. 113.)  Indeed, Plaintiff's commission summary states that Plaintiff sold on average 6.33 cars per month, (<u>id.</u> at p. 218), while the average salesperson sold 8 to 10 per month, and the top sellers sold 18 to 20 per month, (doc. 45-2, p. 18; doc. 48-1, pp. 13–14).  Additionally, the parties agree that when the COVID-19 pandemic began, Defendant temporarily furloughed Plaintiff because she was one of the two lowest performing salespersons.  (Doc. 45-2, p. 8; doc. 48-1, p. 6.)

Plaintiff attempts to rebut the evidence that she was fired for poor performance by alleging that Bryant caused her sales to suffer.  See <u>Chenault v. Ameripride Linen & Apparel Servs.</u>, 188

F. App'x 974, 975–76 (11th Cir. 2006) (indicating that plaintiffs have an opportunity to rebut the defendant's proffered non-discriminatory basis for taking the adverse employment action); see also Fields, 916 F. Supp. 2d at 1365–66 (same); Spivey, 2005 WL 3592065, at *16–17 (same). Specifically, Plaintiff contends in her Response that "Bryant was the direct proximate cause of [her] drop[] in sales" because he "began taking sales deals from her and splitting her sales with other employees" after she rejected his sexual advances. (Doc. 48-2, pp. 16–17; see also id. at p. 21.) Indeed, Plaintiff alleged in the Charge and the Peacock E-mail that Bryant rejected or split her deals because she refused to have sex with or date him. (Doc. 41, p. 182 ("After continuously rejecting Bryant's advances he would find reasons to reject my deals and allow employees who had no involve[ment] in my sale[s][] to receive partial credit and compensation."); id. at p. 227 ("I made less money because I refused to be his mistress. I had a lot of deals that he refused to work because I would not sleep with him.").) However, Plaintiff has not pointed to or provided evidence of any specific instances to substantiate her allegations that Bryant "began taking sales deals from her" or "refused to work" her sales deals, much less that he did so because she declined to engage in a sexual relationship with him. (Doc. 48-2, p. 16; doc. 41, p. 227.) "[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1987); see Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value); Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989) ("Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment."). Plaintiff also has failed to cite to any evidence tending to prove that Bryant split her deals with "employees who had no involve[ment] in [her] sale[s]." (Doc. 41, p. 182.) Although Plaintiff pointed to evidence that, in April 2020, Bryant permitted another salesperson

to sell a vehicle that the brother of Plaintiff's customer had test-driven the day before, (doc. 45-2, p. 16, doc. 48-1, p. 12; see doc. 41, pp. 96–97), the evidence shows that Bryant's conduct with respect to this deal was profit-motivated and had nothing to do with Plaintiff's alleged rejection of his advances.  Plaintiff concedes that Bryant told her that the vehicle was sold to the buyer for a higher price than her customer would have paid *and*—unlike her customer, who planned to pay cash—was financed through the Dealership, resulting in greater profits.  (Doc. 41, pp. 96–100; see also doc. 45-2, p. 16, doc. 48-1, p. 12.)  Additionally, during her deposition, Plaintiff testified at length that she believed Bryant's conduct—i.e., selling vehicles at higher prices and with greater interest rates to customers who are financing the vehicle with the Dealership—was "unethical" and dishonest because it was designed to "make more money."  (See doc. 41, pp. 99–102.)  Indeed, Plaintiff explicitly stated that, after the April 2020 deal, she "put everything together" that "none of [her] deals were going through" because Bryant was engaging in *these practices*—not because she refused to have sex with him.  (Id. at p. 99.)  Moreover, Plaintiff testified that, after confronting Bryant about the sale, he told her that "all was not lost" and offered her half of the commission if she agreed to deliver the vehicle to the buyer.  (Id. at p. 98.)   Thus, evidence concerning Bryant's conduct with respect to the April 2020 deal does not support Plaintiff's contention that Bryant interfered with her deals (thereby harming her sales performance) because she rejected his advances.  Accordingly, it does not rebut Defendant's evidence that it fired Plaintiff for reasons independent from Bryant's alleged harassment.

In light of the forgoing, Plaintiff has "failed to offer evidence rebutting [Defendant's] evidence that she was terminated because of" her poor sales performance and negative attitude regarding attendance and coaching.  Myers v. Cent. Fla. Invs., Inc., 237 F. App'x 452, 455 (11th Cir. 2007).  Thus, because Plaintiff has not adequately "establish[ed] a connection between her

termination and her rejection of [Bryant], her sexual harassment claim cannot survive summary judgment on the tangible employment action theory." Id.; see Walton, 347 F.3d at 1281–82 ("Walton claims that because the disability resulted from the harassment of one of Ortho's supervisors, there is a causal link between the harassment and the discharge. . . .  [T]here is no evidence that Ortho, or any of the employees acting on its behalf, considered Walton's gender when the company terminated her.  To the contrary, the undisputed evidence is that Walton was terminated because she failed to return to work after her short-term disability benefits expired in order to preserve her eligibility for long-term disability benefits. The district court therefore correctly determined that Walton was unable to establish a genuine issue of material fact as to the reason for Walton's termination."); Frederick, 246 F.3d at 1312–13 ("In light of the unrebutted evidence showing that Frederick was denied the promotion to Coordinator II on grounds independent of the alleged harassment, we affirm the district court's determination that Sprint was entitled to summary judgment on Frederick's adverse 'tangible employment action' claim."); Chenault, 188 F. App'x at 975–76 (finding summary judgment warranted where employee who claimed that she was fired for ending her affair with her supervisor "ha[d] not shown that [the defendant's] reason for her termination—her absence from work without giving the company prior notice—was a pretext for discrimination") (citing Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002)).

## III.    The Retaliation Claim (Count II)

Title VII prohibits employers from discriminating against an employee because she "opposed . . an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. § 2000e-3(a) (hereinafter, "Section 704(a)").  "To establish a *prima facie* case of retaliation under

Title VII, a plaintiff must demonstrate: (1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered adverse employment action; and (3) that the adverse employment action was causally related to the protected activity." Harper v. Blockbuster Ent. Corp., 139 F.3d 1385, 1388 (11th Cir. 1998).

In Count II, Plaintiff alleges that Defendant terminated her for engaging in protected conduct—namely, her "opposition to sexual harassment/gender discrimination." (Doc. 1, pp. 7–8.) It is unclear from the Complaint what "opposition" Plaintiff is referring to. Presumably, though, Plaintiff means her rejection of Bryant's sexual advances, since she does not allege anywhere in her Complaint, Charge, or briefing that she complained about or mentioned Bryant's behavior to anyone affiliated with Defendant prior to her termination. (See generally doc. 1, doc. 41, pp. 181–82; doc. 48-2.) Indeed, Plaintiff concedes that she did not complain about or otherwise notify Bryant, Benjamin, or HR about her allegations that Bryant had sexually harassed or made sexual advances towards her while she was employed at the Dealership. (Doc. 45-2, pp. 10–14, 19; doc. 48-1, pp. 7–11; see doc. 41, pp. 38–39; doc. 42, p. 30; doc. 45-3, pp. 2–3; doc. 45-4, pp. 2–3.) Defendant appears to interpret Count II this way, as well; in its Motion, Defendant argues that, to prevail on her retaliation claim, Plaintiff "must prove that had she *not opposed Mr. Bryant*, she would not have been fired." (Doc. 45-1, p. 23 (emphasis added).) Accordingly, Defendant requests summary judgment for failure to satisfy the third *prima facie* element, on the grounds that Plaintiff has failed to show that her termination resulted from her rebuffing Bryant's advances (i.e., her supposed protected activity). (See doc. 45-1, pp. 22–24; see also doc. 51, pp. 10–12.) However, Plaintiff's purported rejection of or opposition to Bryant's advances is not the type of activity which is protected under Title VII's retaliation provision. As noted above, Title VII prohibits employers from retaliating against an employee for "oppos[ing] . . . an unlawful

31

employment practice."  42 U.S.C. § 2000e-3(a); see Zwick v. Univ. of S. Fla. Bd. of Trs., 505 F.

Supp. 3d 1317, 1340–41 (M.D. Fla. 2020) (describing Section 704(a)'s prohibitions on retaliatory

activities).  The Eleventh Circuit has clarified that Title VII prohibits retaliation for "[s]tatutorily

protected *expression*," which includes "internal complaints of sexual harassment to superiors[,] as

well as complaints lodged with the EEOC" and discrimination-based lawsuits.  Pipkins v. City of

Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001) (emphasis added).  Indeed, to constitute

statutorily protected activity, "the employee must . . ., at the very least, communicate her belief

that discrimination is occurring to the employer, and cannot rely on the employer to infer that

discrimination has occurred."  Demers v. Adams Homes of Nw. Fla., Inc., 321 F. App'x 847, 852

(11th Cir. 2009) (internal quotes omitted).  Thus, to the extent that Plaintiff bases her retaliation

claim solely on her alleged refusal to engage in a sexual relationship with Bryant, she has failed to

show that she engaged in protected activity for purposes of the first *prima facie* element of her

claim.[10]  Moreover, as set forth above, the undisputed evidence establishes that she was terminated

_____

[10]  Plaintiff's post-termination activities—sending the Peacock E-mail, informing Harn that Bryant had made sexual advances towards her and filing the Charge—constitute protected activities.  (Doc. 41, pp. 182, 225–28; doc. 45-2, p. 22; doc. 48-1, p. 16); see Rollins v. State of Fla. Dep't of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989) (stating that statutorily protected expression "extends . . . to those . . . who informally voice complaints to their superiors"); Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006) (holding that reporting sexual harassment to executives is "the very essence of protected activity under Title VII"); Pipkins, 267 F.3d at 1201 ("Statutorily protected expression includes . . . complaints lodged with the EEOC.").  However, because this conduct undisputedly occurred *after* her May 13, 2020, termination, Plaintiff could not establish that she was terminated because of these activities (i.e., the third element of a retaliation claim).  See Pipkins, 267 F. 3d at 1201–02 (finding that plaintiff failed to establish a retaliation claim as a matter of law because "any protected expression on her part occurred only after the commencement of the adverse employment actions of which she complains"); see, e.g., Smith v. City of Fort Pierce, 565 F. App'x 774, 779 (11th Cir. 2014) ("Smith had already been placed on administrative leave by the time she filed her EEOC Charge in June of 2010.  Accordingly, Smith cannot establish . . . a causal inference between her filing an EEOC Charge and Recor's earlier decision to place her on administrative leave."); Fitzgibbon v. Fulton Cnty., 842 F. App'x 385, 389 (11th Cir. 2021) ("We conclude the district court did not err in finding that Fitzgibbon failed to establish the causal connection required to establish a *prima facie* retaliation claim because his termination was contemplated separate from, and before, he engaged in any allegedly protected activity.").  Thus, even if Plaintiff had alleged that Defendant terminated her for these activities (which, the Court notes, she has not), her retaliation claim would fail.

due to her absenteeism, attitude, and poor performance. Thus, she cannot establish a causal connection between her allegedly protected activity and any adverse employment action.

Based on the forgoing, Plaintiff's retaliation claim fails as a matter of law, and summary judgment in favor of Defendant is warranted with respect to Count II.

### CONCLUSION

For the forgoing reasons, the Court **GRANTS** Defendant Coastal States Automotive Group Management, LLC's Motion for Summary Judgment.  (Doc. 45.)  Accordingly, Plaintiff's claims set forth in the Complaint are **DISMISSED**.  The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendant and to **CLOSE** this case.

**SO ORDERED**, this 22nd day of August, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA